UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAN WITHERS, ET AL., | ) | CASE NO.1:11CV2004 |
| | ) | |
| Plaintiff, | ) | JUDGE CHRISTOPHER A. BOYKO |
| | ) | |
| Vs. | ) | |
| | ) | |
| CITY OF CLEVELAND, ET AL., | ) | OPINION AND ORDER |
| | ) | |
| Defendant. | ) | |

**CHRISTOPHER A. BOYKO, J:**

This matter comes before the Court upon Defendant Officer Daniel Zola's Motion for Summary Judgment Based on Qualified Immunity. (ECF DKT #14). Because Plaintiffs Dan Withers, as administrator of the estate of Danny Withers ("Withers" or "decedent"), and LaVette Carr, Withers' mother, have not demonstrated a genuine issue of material fact regarding Defendant's entitlement to qualified immunity, the Court grants Defendant's Motion.

## I. FACTS

The following facts are undisputed or viewed in a light most favorable to Plaintiff. On September 30, 2010, Officer Daniel Zola ("Defendant") was attempting to serve an arrest warrant with Sergeant Shoulders and Detective Shapiro on Withers at his home. The arrest concerned Withers' alleged involvement in an armed robbery a few days prior where he allegedly threatened a bank teller with "blowing her head off" if she put a dye pack with the money he ordered her to pack.

On the day in question, Defendant, Shoulders and Shapiro approached Wither's

1

grandmother's house, where Withers resided, to place him under arrest. When they arrived at the house, the three officers knocked and called up for Withers but accidentally stated the name "Kevin." After someone shouted from the second floor that no one living at the house went by that name, Shapiro yelled up "Danny, it's the police." The individual on the second floor then disappeared. At this time, Defendant and the other two individuals believed that the man who had yelled down to them was Withers and continued to knock on the door until Withers' grandmother answered.

Upon the grandmother answering their calls, the three men told her that they were looking for Withers and the grandmother asked if they were looking for her son or grandson. When she opened the door, the officers entered the house and shouted orders for Withers to surrender himself. Withers refused to surrender by hiding so the men began a sweep of the home to find him. Throughout the search, Withers refused to answer Defendant's calls to surrender and continued to evade the three individuals pursuing him. At this time, the three men called backup officers to setup a perimeter around the house to ensure Withers did not escape. Defendant continued to search the house which eventually led him and the other officers to the basement. The basement was poorly lit and contained only one lightbulb. While walking down the basement stairs, the officers continued to yell down to Withers to surrender and show his hands. Withers failed to reply or indicate that he intended to surrender. While sweeping the basement, Defendant had one hand on a flashlight and another hand on his drawn gun, presumably out of fear of what Withers intended to do once the officers found him.

Defendant noticed a closet with the door closed and positioned himself in front of it. Shoulders opened the door and a silhouette moved its right hand up quickly at which point

2

Defendant discharged his service weapon.  The silhouette was that of Withers and Defendant had shot him in the chest.  Defendant acknowledges that because of how dark the closet was, he could only make out a silhouette of a man and he could not assess what, if anything, was in Withers' raised hand.  At this point, Defendant quickly secured Withers and the area around him but failed to find a firearm.

Defendant radioed in an ambulance but Withers died shortly thereafter at a hospital.  While the ambulance was taking Withers away, a neighbor by the name of Dennis Daniel overheard a conversation between "a 'superior officer' and another officer" regarding the events inside.  Daniel claims he observed the "superior officer" ask the other officer what had happened.  The other officer replied that while in the basement, "we said 'get down fucker, get down fucker'" and then presumably Defendant shot Withers.  Daniel confronted the officers about the statement and accused them of shooting Withers when they did not have to.  The officers did not answer and were visibly frustrated with Daniel's questions.  However, Daniel is unable to verify who the officers were that he overheard.

Plaintiffs are Withers' mother and father who brought a § 1983 action on behalf of Withers for a violation of his constitutional rights, which include his Fourth Amendment right not to be unreasonably seized.  Defendant moved for summary judgment on the basis that his use of deadly force against Withers was reasonable and he is, therefore, entitled to qualified immunity.  Previously, the Court granted summary judgment in part to Defendant on the basis that the search of the house was lawful.  The Court ordered limited discovery to ascertain more details regarding Daniel's statement about the police officers' conversation and to assess the qualified immunity defense.  Subsequent to this discovery, Plaintiffs filed a Brief in Opposition

to Defendant's Motion. For the following reasons, the Court grants the remainder of Defendant's Motion because Defendant is entitled to qualified immunity.

## II. ANALYSIS

As a preliminary matter, Plaintiffs appear to still argue that the officers conducted an invalid search in violation of the Fourth Amendment. However, the Court has already addressed the search issue and upheld it as valid in a previous opinion. *Withers v. Cleveland*, No. 1:11CV2004, 2012 WL 4483812 (N.D. Ohio Sept. 27, 2012). Granted, Plaintiffs offer new evidence to suggest that perhaps the Court's initial ruling was incorrect. This new evidence includes: (1) the officers' initial use of the wrong name when calling up to Withers to surrender; (2) the officers' abrasiveness when they told Withers' grandmother to "come down and open the door and let [us] in"; and (3) the officers' abrupt entry into the house without Withers' grandmother consenting to the entrance. But this new evidence does not change the legitimacy of the entry.

The Sixth Circuit has stated that "[a]n arrest warrant founded on probable cause carries with it the limited authority to enter a suspect's home if there is reason to believe that he is there." *United States v. Stover*, 474 F.3d 904, 911 (6th Cir. 2007) (citing *Payton v. New York*, 445 U.S. 573, 603 (1980)). Once an officer has an arrest warrant and reason to believe that the suspect is inside the house, he or she may search all areas of the house where the suspect may reasonably be found. *Id.* (citing *Maryland v. Buie*, 494 U.S. 325, 332-33 (1990)). In this case, Defendant had an arrest warrant for Withers and traveled to where he lived to execute it. Next, although Defendant yelled out the wrong name initially when he arrived at the house, the male voice yelling back down to Defendant disappeared once another officer shouted up "Danny, it's

4

the police." In addition, when the officers spoke with Withers' grandmother, she inferred that someone by the name of "Dan Withers" lived at the house when she asked which "Dan" the officers were looking for. Lastly, although Withers' grandmother did not expressly consent to the officers' entrance, at this point they had reason to believe Withers was in the house and could enter it to enforce a valid arrest warrant. The officers had a valid arrest warrant and reason to believe Withers was in the house to justify entering to locate him. The Court need not address this issue again.

Federal Rule of Civil Procedure 56 requires that a court grant summary judgment to a moving party when the evidence in the record demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. When assessing the evidence, the Court must draw all reasonable inferences in favor of the non-moving party. *Employers Ins. of Wausau v. Petroleum Specialities, Inc.*, 69 F.3d 98, 101-102 (6th Cir. 1995); *Jones v. Beatty*, 4 F.Supp.2d 737, 741 (N.D. Ohio 1998) (citing *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 245 (6th Cir. 1997), *cert. denied*, 522 U.S. 967 (1997)). In the context of an excessive force claim, such as here, a plaintiff must "designate specific facts demonstrating that the police officer acted unreasonably" to survive a motion for summary judgment. *Beatty*, 4 F.Supp.2d at 741 (citing *Smith v. Freland*, 954 F.2d 343, 345 (6th Cir. 1992), *cert. denied*, 504 U.S. 915 (1992)).

Government officials are entitled to qualified immunity so as not to "stand trial or face the other burdens of litigation" as a result of performing their everyday duties. *Dunigan v. Noble*, 390 F.3d 486, 490 (6th Cir. 2004) (quoting *Saucier v. Katz*, 553 U.S. 194, 200 (2001)). In the context of police officers, this entitlement recognizes that they may err when performing

their discretionary duties but that should not automatically place them in the line of liability. *Livermore ex rel. Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). Qualified immunity ensures that a police officer will act rather than not for fear of liability in the future.

The two-fold test for determining if a police officer is entitled to qualified immunity when a plaintiff alleges an excessive force claim against him or her is: (1) whether the officer violated a constitutional right and if so, (2) whether that right was clearly established. *Saucier*, 553 U.S. at 201. The Court must look at the "objective legal reasonableness" of the officer's actions "in view of the circumstances the officer confronted assessed in light of 'clearly established' legal rules." *Dunigan*, 390 F.3d at 491 (citing *Saucier*, 553 U.S. at 202; *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

To determine if an officer violated a constitutional right, the Court must look at the reasonableness of the officer's conduct. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The use of deadly force by an officer is only constitutionally reasonable if there is probable cause to believe that the person poses a threat of serious physical harm to the officer or others. *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). A court must avoid the "20/20 vision of hindsight" when analyzing whether an officer used reasonable force; rather, a court must consider the use of force from the perspective of a reasonable officer at that moment. *Sample v. Bailey*, 409 F.3d 689, 697 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396). In addition, a court must consider reasonableness in the context of a police officer making a "split-second judgment- in circumstances that are tense, uncertain and rapidly evolving- about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

The Supreme Court has identified a number of factors a court should consider when

assessing the reasonableness of the force used: "(1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the police officers or others; and [(3)] whether the suspect actively resisted arrest or attempted to evade arrest by flight." *Lubelan*, 476 F.3d at 404 (citing *Graham*, 490 U.S. at 396).

The ultimate issue in this case is whether Defendant's use of deadly force against Withers was reasonable in light of the circumstances Defendant was facing at the time of the shooting. Defendant claims that the circumstances surrounding the shooting justify the use of deadly force. Defendant maintains that he was arresting Withers for a violent crime.  In addition, Defendant points out that he was aware of Withers' violent criminal history, which includes weapons violations.  Also, while Defendant was searching for Withers, Withers refused to come out of hiding, which demonstrated evasiveness.  When Defendant ultimately found Withers, it was in a dark basement and Withers was hiding in a closet.  Further, upon discovery, Withers made a sudden hand movement toward Defendant without indicating an intent to surrender and Defendant thought Withers was attacking him.

Plaintiffs claim Defendant is not entitled to qualified immunity for a list of reasons.  First, Plaintiffs dispute how much of Withers' criminal history Defendant knew.  Second, Plaintiffs maintain that Withers did not pose a threat to the public-at-large so Defendant did not use deadly force to protect the public, making such use unreasonable.  Third, Withers did not show resistance prior to Defendant shooting him.  Fourth, Withers did not pose a flight risk as there were police officers surrounding the house during the search and seizure.  Fifth, Withers intended his right hand movement to indicate surrender after Defendant found him.  Sixth, Defendant did not find a gun near Withers' body and, had Defendant looked at his hand before

shooting, he would have known there was no gun. And lastly, Plaintiffs claim that Daniel's statement regarding the officers' conversation outside of the house demonstrates the decision to shoot was not "split-second."

After viewing all the evidence in a light most favorable to Plaintiffs, the Court finds that Defendant is entitled to qualified immunity. The following facts are undisputed. Defendant was executing an arrest warrant against Withers for armed robbery where Withers allegedly threatened to blow the head off a bank teller. Defendant, while sweeping every floor of the house, called out to Withers to surrender, which he refused to do; at this point it was reasonable for Defendant to assume that Withers did not intend to surrender and was perhaps lying in wait. *See Robinette v. Barnes*, 854 F.2d 909, 913-914 (6th Cir. 1988) (holding that when an officer "was forced to explore an enclosed unfamiliar area in which he knew [the suspect] was hiding" and the suspect was afforded opportunities to surrender and indicated he was unwilling to surrender, the officer was "justified in using whatever force necessary, even deadly force, to protect himself and the other officers and to apprehend the suspect"). When walking into an unfamiliar and dimly lit basement, searching for an armed robbery suspect, Defendant again called down to Withers telling him to surrender but Withers did not respond. Defendant had his weapon drawn, demonstrating he was fearful of Withers' intended actions once Defendant found him. When Defendant came upon the closet that Withers was hiding in, Defendant could only make out a silhouette of Withers' body and after Defendant yelled at him to "get down," Withers did not say a word but moved his right hand quickly toward Defendant. Given these circumstances, it was reasonable for Defendant to fear for his life and to use deadly force.

Because Plaintiffs have failed to establish that Defendant violated Withers' Fourth

8

Amendment right not to be unreasonably seized, the Court does not need to address the second prong of the qualified immunity analysis.

        **A.**        **Defendant's Knowledge Of Withers' Violent Criminal History**

Defendant claims that based on his knowledge of Withers' violent criminal history it was reasonable for him to fear for his life when searching for Withers.  Plaintiffs dispute how much of Withers' criminal history Defendant knew to justify a reasonable fear for his life.  However, even assuming Plaintiff is correct and Defendant did not know about Withers' violent history, this contention is immaterial to the rest of the analysis.

In their Brief in Opposition, Plaintiffs state that "there is some discrepancy regarding what, if anything, the officers did to educate themselves about Withers' arrest history."  (ECF DKT #34).  However, even assuming Defendant did not know Withers' criminal history, Withers was wanted for armed robbery, which is a violent offense.  This, itself, suffices to put Defendant on notice of a potential dangerous arrestee.  Given the fact that Withers was accused of robbing a bank and threatening to blow the head off a bank teller, it was reasonable for Defendant to fear that Withers was capable of using deadly force against the arresting officers.  *See Larkett v. Hameric*, No. 96-6267, at *3 (6th Cir. May 20, 1998) (finding that when police officers have probable cause to believe they are pursuing a suspect for a crime involving the threatened use of serious physical harm, they are justified in using deadly force if unable to apprehend the suspect).  Plaintiffs have not demonstrated a genuine issue of material fact.

        **B.**        **Withers Posed Neither A Flight Risk Nor A Threat To The Public**

Plaintiffs maintain that with officers surrounding the perimeter, Withers did not pose a flight risk or a threat to the lives of the public.  However, this assertion does not dispute whether

Defendant was reasonably in fear of *his own* life when using deadly force. Plaintiffs have not managed to demonstrate how a reasonable jury might assume that officers surrounding a house could protect an officer in the basement of the house standing merely feet from a fugitive avoiding arrest for a violent crime. Surely Withers did not pose a threat to the public given the police presence outside of the house. If that were the relevant issue, then perhaps Plaintiffs would have a genuine issue of material fact. However, Defendant contends he feared for his own life and Plaintiffs' assertion does not bear on whether Defendant used reasonable force when protecting himself. Whether Withers posed a flight risk or a threat to the public is not material and does not bear on the analysis.

      C.      **Withers Did Not Resist Arrest**

Plaintiffs maintain that part of determining whether a police officer used reasonable or excessive force is whether the individual was resisting arrest. Plaintiffs claim that at no time did Withers resist arrest. Although the argument could be made that hiding and avoiding the police when they are attempting to execute a valid arrest warrant is akin to resisting arrest, the Court need not reach that argument because the dispute is not material to the merits. Merely because someone has not had the opportunity to physically fight off the police for purposes of "resistance" does not mean that an officer that later uses deadly force against that individual was acting unreasonably. Plaintiffs do not dispute that Withers knew that Defendant was there to arrest him for a violent crime and that Defendant was justified in assuming Withers was hiding from him. Therefore, it was reasonable for Defendant to fear that by hiding and avoiding detection, Withers was buying time so he could attack Defendant. *See Robinette, supra*. Coupling Withers' evasion with the undisputed fact that he made a sudden movement toward

Defendant once found, Defendant was justified in assuming Withers was going to attack him. The lack of an actual "resistance to arrest" is immaterial.

> **D. Withers Was Attempting To Surrender When He Moved His Hand Toward Defendant**

Plaintiffs take issue with whether Withers was making a threatening gesture when he moved his hand toward Defendant, which ultimately led to Defendant firing his service weapon. However, when taken into consideration with the surrounding circumstances of the situation, what Withers intended by jolting his hand is not material as to whether Defendant used reasonable force. Rather, the question is more akin to whether the hand movement justified Defendant's use of deadly force in lieu of the other surrounding circumstances. The Court finds Defendant was justified in using deadly force.

At the time of the shooting, Defendant and the other officers had plenty of reasons to fear for their lives. For one, they were arresting Withers for an armed robbery where he told the bank teller that he would blow her head off if she did not comply with his demands; Plaintiffs themselves admit that armed robbery is a violent crime. In addition, Defendant had spent the previous few minutes sweeping the house in search of Withers while calling out his name and for him to surrender; again, Withers refused to answer the calls for surrender. Defendant finally searched the house's dark basement where he and the other officers felt the need to have their flashlights and guns drawn to enter. As Defendant walked down the steps, he yelled out again for Withers to come out and Withers did not comply. When he found Withers in the closet, Withers did not say anything but rather jolted a hand upward. Given the surrounding circumstances, it was reasonable for Defendant to fear for his life when faced with such a sudden movement.

Plaintiffs claim that when Withers shot his hand upward, it was to comply with the order for him to come out of hiding. However, Plaintiffs cannot place reliance on Defendant's initial attempt to have Withers surrender peacefully to now blame Defendant for the shooting. Defendant indeed told Withers to surrender with his hands up. However, Withers refused to comply and chose to hide instead. At this point, it was reasonable for Defendant to assume that Withers would not surrender peacefully. Whether Withers had a last second change-of-heart without expressing as much is irrelevant to how a reasonable officer would react in a similar situation. When Defendant ultimately came across Withers, Withers made a quick movement with one arm without saying a word. Defendant's reaction was reasonable.

### E. Defendant Should Have Realized That Withers Was Unarmed Before Shooting

Plaintiffs also take issue with the fact that had Defendant properly examined Withers' hand before shooting him, Defendant would have realized Withers did not have a gun. Using the Sixth Circuit's decision in *Sample v. Bailey*, Plaintiffs try to show how Defendant's failure to recognize that Withers was unarmed before Defendant shot him is dispositive of the overall issue. 409 F.3d 689 (6th Cir. 2005). However, *Sample* is distinguishable on numerous grounds.

To begin, the officers in *Sample* discovered the plaintiff hiding in a cabinet where movement was extremely limited. *Id.* at 697. With hands visible and empty, the plaintiff made no sudden movements prior to the officers ordering him to exit the cabinet. *Id*. In addition, the court noted that in order for the plaintiff to comply with the order the officers had to expect some movement. *Id*. The other officer accompanying the defendant indicated he holstered his weapon to arrest the plaintiff while the plaintiff was exiting the cabinet because he did not believe the plaintiff was a threat. *Id*. This called into doubt the defendant's own fear at the time of the

12

shooting. *Id*. Lastly, the plaintiff placed his hands on top of the cabinet to climb out at the behest of the officers when the defendant shot him even though there was no other way for the plaintiff to exit the cabinet. *Id*.

Each of these deciding factors is distinguishable from the case at hand. First, Withers' hands were not visible in the darkness of the basement and Defendant did not have enough time to properly observe them before Withers jerked his hand upward. Further, Sergeant Shoulders had his gun pulled and was ready to fire if Withers had returned fire at Defendant which indicates that others accompanying Defendant shared a similar belief that Withers might be dangerous.[1] Lastly, the plaintiff in *Sample* remained still when found and only moved when ordered to by the defendant, whereas Withers made a sudden movement after Defendant found him without first indicating surrender.

Additionally, this case is distinguishable from *Floyd v. Detroit*. 518 F.3d 398 (6th Cir. 2008). In *Floyd*, the Sixth Circuit found that a police officer that fired his weapon at an individual outside without warning, when the officer had no reason to believe the individual was armed or dangerous, was not entitled to qualified immunity. *Id.* at 402. In contrast, Withers: (1) was hiding within the house; (2) was avoiding arrest; (3) gave no indication that he was not armed but rather indicated that he was not going to be arrested peacefully; and (4) was wanted for a crime that gave the officers reason to believe he was dangerous. The facts of this case do

---

[1]Interestingly, Plaintiff states that Shoulder's decision not to fire demonstrates that the officers did not believe Withers was a threat. However, Shoulder's decision not to fire came after he realized Withers was not firing back and, in fact, Shoulders stated he was ready to fire after Defendant discharged his weapon. Does Plaintiff imply that if Defendant truly was in fear of his life then the other officers would have discharged their entire magazines at Withers? Surely that would be unreasonable given that Defendant had already subdued Withers by the time Shoulders would have fired.

not match up with the facts of *Floyd*.

The Sixth Circuit has previously held that even where the use of deadly force was not warranted in hindsight, the police officer was still entitled to qualified immunity. *See Bell v. City of Cleveland*, 125 F.3d 855 (6th Cir. 1997) (finding qualified immunity justified when a police officer shot a young boy carrying a toy gun). In this case, even assuming that Plaintiff is correct and Withers could not harm Defendant, Withers' actions required Defendant to respond to ensure his own survival. In the darkness of the basement, Defendant's adrenaline was likely high as he was pursuing a suspect for a violent crime where he allegedly threatened to blow the head off a bank teller and who was currently refusing to comply with Defendant's orders to surrender. At this point, it was reasonable for Defendant to believe Withers was dangerous and was trying to harm him. When Withers raised his hand without Defendant first trying to ascertain if Withers had a weapon, Defendant reasonably believed Withers might be attacking him. Viewing this matter in a light most favorable to Plaintiffs, a reasonable jury could not conclude otherwise.

### F.  Daniel's Statement Regarding The Officers' Conversation

Plaintiffs lastly stand on the premise that Dennis Daniel's statement about what he overheard police officers say outside of the Withers' home demonstrates that Defendant did not act pursuant to any "split-second" decision. Plaintiffs maintain that one police officer, whom they fail to identify, stated that the officers in the basement originally said "get down fucker, get down fucker" and then fired at Withers demonstrating that Defendant had ample time to analyze Withers' condition and realize he was not a threat. However, this does not demonstrate the genuine issue of material fact that Plaintiffs assert.

To begin, Plaintiffs never affirmatively demonstrate which officers were having the conversation. Daniel claims that based on the conversation it was apparent that one of the officers talking was in the basement at the time of the shooting. But without any support regarding the identities of the officers, this is merely an assumption. For purposes of summary judgment, however, the Court will assume Daniel's conclusion is correct. Even assuming this conversation took place between Defendant and other officers, this does not demonstrate that Defendant acted unreasonably: this neither disputes the fact that Defendant could barely see Withers' silhouette nor that Withers made a sudden movement with his right hand. Had Defendant and the other officers told Withers to get down, this does not rebut the undisputed testimony that Withers shot his right arm up quickly in extreme darkness leading Defendant to use his service weapon. Defendant could have said the alleged statement in a matter of seconds and Withers' response could have been to raise his arm quickly at Defendant in a threatening manner, forcing Defendant to protect himself. Considering the surrounding circumstances of the encounter, the statement does not demonstrate a genuine issue of material fact.

### III.  CONCLUSION

The facts, viewed in a light most favorable to Plaintiffs, do not demonstrate a genuine issue of material fact that would bar the Court from granting summary judgment to Defendant.

Therefore, the Court finds Defendant entitled to qualified immunity and grants him summary judgment.

    **IT IS SO ORDERED.**

                                      s/ Christopher A. Boyko
                                      CHRISTOPHER A. BOYKO
                                      United States District Judge

Dated: May 1, 2014